## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DENISE BOMBA                    :
                                :
            Plaintiff,          :
                                :
    v.                          :     3:16-CV-01450
                                :     (JUDGE MARIANI)
COMMONWEALTH OF PENNSYLVANIA    :
DEPARTMENT OF CORRECTIONS, et al., :
                                :
            Defendants.         :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On July 13, 2016, Plaintiff, Denise Bomba, brought suit against Defendants

Commonwealth of Pennsylvania Department of Corrections ("DOC"), the State Correctional

Institution at Waymart ("SCI Waymart"), John E. Wetzel, Secretary of DOC, in his official

capacity, Wayne Gavin, the Superintendent of SCI Waymart, in his individual and official

capacity, Rhonda Ellett, the Deputy Superintendent for Facilities Management at SCI

Waymart, Paul DelRosso, Deputy Superintendent for Centralized Services at SCI Waymart,

Laura Banta, the Community Corrections Program Manager at SCI Waymart, Joseph

Villella, a Lieutenant at SCI Waymart, Joseph Silva, a Nurse Supervisor at SCI Waymart,

and Brad Soden, a Corrections Officer at SCI Waymart. Defendants Ellett, DelRosso,

Banta, Villella, Silva, and Soden were each sued in his/her individual and official capacities.

(Compl., Doc. 1, ¶¶ 6, 7, 10, 11, 12, 13, 14, 15, 16, 17).

The Plaintiff filed an Amended Complaint (Doc. 18) on May 26, 2017. The First Amended Complaint did not add or drop any defendant.

An Answer to the Amended Complaint was filed on June 20, 2017 (Doc. 19).

On August 30, 2017, the Defendants collectively filed a Motion for Summary Judgment (Doc. 24). Briefing by the parties on the Defendants' Motion for Summary Judgment was completed on November 6, 2017. Thereafter, Defendants' Motion for Summary Judgment was referred to Magistrate Judge Martin J. Carlson for a Report and Recommendation ("R&R").

On September 4, 2018, Magistrate Judge Carlson issued his R&R (Doc. 51) wherein he recommended that "Defendants' motion for summary judgment (Doc. 24) be DENIED as to a sole ADA privacy claim against Defendants Villella and Soden found in Count I of the Amended Complaint and as to the corresponding RA claims against the DOC and SCI Waymart filed in Count II, but that the motion should be GRANTED in all other respects." (Doc. 51, at 47). In so recommending, the Magistrate Judge also noted that Plaintiff Bomba, in her brief in opposition to Defendants' motion for summary judgment (Doc. 49, at 13-14 n. 2), voluntarily withdrew her claims against Defendant Gavin. (Doc. 51, at n.1).

Plaintiff and Defendants both timely filed Objections to the R&R. (Docs. 54, 56).

For the reasons explained herein, the Court will adopt in part and reject in part the pending Report and Recommendation.

## II. ANALYSIS

A District Court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the Court. 28 U.S.C. § 636(b)(1)(B). If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* at § 636(b)(1)(C); *see also, Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011); M.D. Pa. Local Rule 72.3.

Here, timely objections to the Magistrate Judge's R&R were filed by Plaintiff and Defendants. (Docs. 54, 56). Plaintiff and Defendants have fully briefed their respective objections. Plaintiff, in doing so, has stated both in her objections and in her brief in support thereof, that she does not object to the Magistrate Judge's recommendations "with respect to the disposition of her claims against Defendants Silva and DelRosso and her Title VII and equal protection challenges in Courts IV and VIII, respectively." (Doc. 54 at 5, n.1; *see also*, Pl.'s Br. in Supp. of her Objs., Doc. 55, at 3, n.2).

Thus, at issue here are Plaintiff's objections as to the recommendation that summary judgment be granted to Defendants with respect to Counts III, V, VI, and VII, and Defendants' objections to the Magistrate Judge's recommendation that summary judgment be denied as to Counts I and II. Bomba does not object to the grant of summary judgment

to Defendants DelRosso and Silva, and as to her Title VII and equal protections claims in Counts IV and V, has withdrawn all claims against Defendant Gavin and does not object to the dismissal of Defendant Wetzel.[1]

The Court will address the parties' Objections in turn.

## 1. Plaintiff's Objections

As with the analysis of Defendants' Objections, which will follow the analysis of Plaintiff's Objections, the Court begins by noting that the statement of material facts submitted by Defendants in support of their motion for summary judgment (Doc. 25) has been admitted by the Plaintiff in her response (Doc. 48) with the exception of paragraphs 28 and 69, which were denied by Plaintiff. Although Plaintiff, in responding to Defendants' statement of material facts ("SOMF") has attached statements to each of her admissions which dispute any "suggestion or inference", "characterization", or other conclusion which Plaintiff believes Defendants have drawn from the undisputed facts, such argument following an admission in response to Defendants' SOMF is unnecessary and may well be improper in a response to a statement of material facts. In any event, such additional argument does not convert Plaintiff's admissions into non-admissions. Nonetheless, the Court understands that several of the paragraphs of Defendants' SOMF present recitations of deposition testimony of various Defendants as to which Plaintiff's admission is limited to acknowledging that the testimony was accurately quoted. (See, e.g., SOMF, ¶¶ 74, 75, 78).

---

[1] Plaintiff previously voluntarily withdrew her § 1983 conspiracy claim against all Defendants in

Plaintiff's first objection requests that this Court reject the Magistrate Judge's suggestion that Defendants be permitted to file a second dispositive motion on Plaintiff's claims in Count I and Count II against Defendants Villella, Soden, DOC and SCI Waymart, for improper disclosure of her confidential medical information, specifically, Bomba's use of Klonopin. (Doc. 55, at 4). Plaintiff argues that the Defendants "had a full opportunity in their summary judgment and reply briefs to provide detailed argument that these Defendants violated the ADA and RA by disclosing her confidential medical information." (*Id.* at 4-5). Plaintiff asserts that allowing Defendants another opportunity to seek summary judgment on these claims would "significantly delay the resolution of the merits of this case, resulting in undue prejudice to Bomba." (*Id.* at 5).

In response, Defendants assert that they afforded "limited treatment to the specific subsections of the statute at issue because Plaintiff never properly raised the claim under the ADA subsection referenced (and corresponding RA provisions)." (Defs.' Br. in Opp. to Pl.'s Objs., Doc. 59, at 19). While the substance of Defendants' objections to the R&R's recommendation that summary judgment be denied to them on Counts I and II of Plaintiff's Complaint will be addressed in the Court's analysis of the Defendants' objections, the Court declines to adopt the Magistrate Judge's suggestion that Defendants be allowed an additional opportunity to obtain summary judgment on Counts I and II through supplemental briefing. While it is unclear whether the Magistrate Judge intended this suggestion to be

---

Count IX. (Doc. 49, at 5-6 n. 2).

part of the formal Recommendation (see Doc. 51, at 47, n.15), to the extent it may be considered as part of the Recommendation to this Court, it is not adopted.

Next, the Plaintiff asserts that the Magistrate Judge erred in concluding that Defendants had reasonable suspicion to conduct alcohol testing of Bomba. Plaintiff argues that the record evidence, viewed in the light most favorable to her, shows that "after conducting a reasonable suspicion analysis following Bomba's positive ion scans, Defendants concluded that she was not under the influence of alcohol or drugs and was fit for duty, thereby refuting any reasonable suspicion to require a breath alcohol test." (Doc. 55, at 5)(emphasis in original). Plaintiff argues that the Magistrate Judge erred in finding that Defendants' alcohol test requirements, even in the absence of reasonable suspicion, furthers Defendants' interest in maintaining a safe and secure work environment and that Defendants, in any event, had reasonable suspicion to conduct the Plaintiff's alcohol testing. (Id. at 6). Plaintiff further challenges Defendants' claim that they have established a basis for their belief that all employees with a positive ion scan pose a safety risk due to alcohol use and, instead, Plaintiff argues that the Drug Interdiction Manual does not support Defendants' position. (Id. at 6-7).

Plaintiff additionally asserts that Defendants found that Bomba was not under the influence of alcohol and/or drugs and was fit for duty and that a drug test, but not an alcohol test, was recommended. (Id. at 7). Thus, Plaintiff argues that a dispute of fact exists as to

6

whether the Defendants had a legitimate business reason for requiring Bomba to submit to an alcohol breath test when individualized reasonable suspicion for such test was absent.

The Defendants respond that the Magistrate Judge correctly concluded that Plaintiff's alcohol breath test and Defendant Villella's fitness for duty inquiries were job related and consistent with business necessity. In support of these assertions, Defendants maintain that the Drug Interdiction Procedural Manual (Doc. 26-1) in Sections 5 and 7 provide for automatic drug and alcohol screenings where there are two positive ion scans, citing the testimony of Laurie Hilsinger, the DOC's 30(b)(6) witness regarding Section 5 of the Drug Interdiction Manual. (Doc. 59, at 6). Defendants argue that "DOC policy is that positive scans unequivocally result in testing despite any individual employee's subjective beliefs. Positive ion scans – three times in this case – are grounds for follow-up testing for alcohol and drugs." (*Id*. at 7). Further, Defendants argue that Plaintiff has inaccurately stated the findings of Judge Carlson with respect to alcohol testing, suggesting that the Judge's R&R incorrectly finds the alcohol testing requirement in this case legitimate even without reasonable suspicion. (*Id*. at 7-8). Defendants instead assert that the Drug Interdiction Manual "specifically lists positive ion scans as reasonable suspicion" citing to their SOMF ¶ 7 which states:

> Reasonable suspicion is defined as "the belief that an employee has violated the controlled substance and/or alcohol prohibitions," and it can be based upon indicators including specific observations or a "positive reading from the electronic drug detection equipment." Drug Interdiction Manual, p. 5-2, § 5(B).

7

(Doc. 25, ¶ 7). Accordingly, Defendants argue that there was "individualized reasonable suspicion" when Bomba scanned three times as positive in the electronic drug detection equipment ("EDDE") testing process. (Doc. 59, at 8).

The Magistrate Judge, in addressing Bomba's claim that the remaining defendants in Count I violated Section 12112(d) of the Americans With Disabilities Act, 42 U.S.C. §12101 *et seq.*, first correctly notes that "[t]his provision extends the prohibition on discrimination to 'include medical examinations and inquiries.'" (Doc. 51, at 38). The R&R continues, noting that "[i]n particular, Section 12112(d)(4) makes it illegal for employers to 'require a medical examination . . . [or] make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity.' 42 U.S.C. §12112(d)(4)(A)." (*Id.*).

The remaining Count I defendants do not object to the Magistrate Judge's determination that "Bomba need not prove that she was disabled in order to prevail on the particular ADA and RA claims that she asserts." (Doc. 51, at 39). The Court adopts the R&R's analysis of the governing case law, succinctly summarized in *E.E.O.C. v. Grane Healthcare Company,* 2 F.Supp.3d 667, 679-680 (W.D. Pa. 2014) ("Unlike § 12112(a), which aims to protect a discrete class of 'disabled' persons from discrimination, § 12112(d) contains no language limiting the category of applicants and employees entitled to statutory protection.").

8

On the record before this Court, in affording the non-moving party, Plaintiff Bomba, every reasonable inference from the record, this Court finds that there is a genuine dispute of material fact as to whether Bomba was properly subjected to alcohol testing after her three positive readings from the electronic drug detection equipment. This determination begins with an examination of the Drug Interdiction Procedural Manual (Doc. 26-1) and its provisions for reasonable suspicion testing. "Reasonable Suspicion" is defined in Section 5(B) of the Manual as follows:

> Reasonable suspicion has been defined as the belief that an employee has violated the controlled substance and/or alcohol prohibitions, based on specific contemporaneous, articulable observations concerning the appearance, behavior, speech, or body odors of the employee. Other indictors [sic] of reasonable suspicion include:
> 1. a positive reading from the electronic drug detection equipment;
> 2. a positive reaction from a K-9 to an employee's person and/or property; and/or
> 3. notification by proper authority that an employee has been arrested and charged with a violation of any criminal drug statute involving the manufacture, distribution, dispensing, use, or possession of any controlled substance.

(Drug Interdiction Procedural Manual, § 5(B)).

As with any integrated document, the meaning of a single section can only be ascertained by reference to the other sections to which it interrelates. Pursuant to "Reasonable Suspicion for Positive Reaction to Drug Interdiction Equipment, Positive Reaction by K-9 Team, or Notification by Proper Authority", in Section 5(D) of the Manual:

> The following procedures shall be used when there is reasonable suspicion due to a positive reaction to drug interdiction equipment . . . :

9

1. If an employee has a positive reaction to electronic drug detection equipment in accordance with Section 7, Electronic Drug Detection of this manual, the employee, at the discretion of the Department, may be subject to reasonable suspicion drug testing. In the event that an employee is subject to the aforementioned testing, it is not mandatory for the employee to be removed from duty until verified test results of the reasonable suspicion drug testing are received. The decision to remove an employee from duty prior to the receipt of verified test results will be based upon an assessment of the employee's fitness for duty. If an employee is removed from duty and the test results are negative, the employee shall be returned to work with back pay or the return of paid leave taken. (Id. at 5-3).

(Drug Interdiction Procedural Manual, § 5(D)).[2]

Thus, on the face of the Drug Interdiction Manual, an employee who has a positive reaction to electronic drug detection equipment "may be subject to reasonable suspicion drug testing."

Conversely where reasonable suspicion is determined based upon observable behavior, Section 5(C) provides:

A supervisor/manager who has been trained by the Department in accordance with this policy, shall require an employee to submit to a controlled substance and/or alcohol test when the supervisor/manager has a reasonable suspicion to believe the employee has violated the controlled substance and/or alcohol prohibitions.

(Id. at § 5(C)(1)).

---

[2] Section 7(C)(3) of the Drug Interdiction Manual spells out the procedure for testing "Staff." In particular, subsection 3(f) addresses the circumstances under which a staff member is considered to test positive when subjected to an EDDE scan. It further recognizes that with respect to staff members, "there can be occasions when legitimate circumstances exist that may result in a positive EDDE scan. The most likely cause of this occurrence is the staff member's use of prescription medications that contain narcotics or other drugs that the EDDE is programmed to alarm on. Should the staff member being tested claim that the EDDE alarm is due to one or several prescribed medications, that employee can provide current

Here, it is undisputed that "reasonable suspicion" was established for the testing of Bomba based on her testing positive three times through the ion scanning of the Electronic Drug Detection Equipment. The language of Sections 5(B) and 5(C) of the Drug Interdiction Manual, and in particular Section 5(D), provide in the circumstance of a positive reaction to EDDE testing that the employee, at the discretion of the Department "may be subject to reasonable suspicion drug testing." Section 5(D) does not authorize alcohol testing in the circumstance of a positive reaction to EDDE. Yet Bomba was subjected to alcohol testing nonetheless. Defendants argue, and the R&R states, that alcohol is a form of drug so that "it was reasonable to follow up a positive ion scan with alcohol testing, and additionally Bomba admitted she had consumed alcohol within the past 24 hours, thus making her alcohol testing far from random." (Doc. 51, at 42). Defendants, in their response to Plaintiff's objection, cite the testimony of Laurie Hilsinger, the Fed. R. Civ. P. 30(b)(6) DOC witness who, Defendants assert, "testified that it is policy to require both drug and alcohol screenings because the ion scan does not confirm nor deny every substance that the employee is potentially on, which may include alcohol, once a positive result for one substance is triggered." (Doc. 59, at 6). Whether it is the policy of the DOC and "standard practice" for an employee to be sent for *both* a drug and alcohol test following positive ion scan presents a genuine dispute of fact for trial. This is so because Laurie Hilsinger's

---

documentation in the form of a doctor's excuse or a valid prescription for the medication that is suspected to have caused the alarm. . . ." (Drug Interdiction Procedural Manual, § 7(C)(3)(f)).

testimony places her credibility at issue and it is axiomatic that a Court may not assess credibility in determining whether to grant or deny summary judgment.[3]

Further establishing that the question of whether Bomba was unlawfully subjected to alcohol testing presents an issue for trial is an exhibit entitled "Determination of Reasonable Suspicion to Request an Employee Alcohol or Drug Test" (Doc. 32-1, Ex. H). This document, completed by Defendant Villella, contains in Section IV statements that Villella did not find Bomba to be under the influence of alcohol and/or drugs; that she was fit for duty; and recommending only a drug test and not an alcohol test. The document also contains, however, the consent of Bomba, as manifested by her signature in Section V, to "drug and/or alcohol testing based on reasonable suspicion under Policy 6.3 12. . . ."

In summary, there exist disputes of fact for trial as to whether the Drug Interdiction Manual requires alcohol testing in the circumstance of a positive scan through the EDDE ion

---

[3] See Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764 (3d Cir. 2013):

Under Rule 56, . . . a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party asserting that there is a genuine dispute of material fact must support that assertion by "citing to particular parts of ... the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations..., admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A). In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

716 F.3d at 772. See also, Doebblers' Penn. Hybrids, Inc. v. Doebbler, 442 F.3d 812, 820 (3d Cir. 2006)(stating that credibility determinations "are inappropriate to the legal conclusions necessary to a ruling on summary judgment. . . .A District Court should not weigh the evidence and determine the truth itself, but should instead determine whether there is a genuine issue for trial."); J. F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1254, 1531 (3d Cir. 1990) ("We are keenly aware that credibility determinations are not the function of the Judge; instead the non-movant's evidence must be credited at this stage.").

scanning process and, if not, whether it is the standard policy of the DOC to require both drug and alcohol testing in the circumstance of a positive EDDE ion test scan and whether Bomba was subject to alcohol testing in the circumstance where there was no observable behavior or other physical evidence to justify reasonable suspicion alcohol testing. Plaintiff's objection will thus be sustained and Plaintiff's ADA and RA claims in Counts I and II will proceed to trial.

Next, Plaintiff urges this Court to reject the Magistrate Judge's recommendation that "summary judgment be entered as to Bomba's claims that Defendants' improper disability-related inquiries are not job-related and consistent with business necessity." (Doc. 55, at 8). Plaintiff contends that the Magistrate Judge failed to address whether "Defendant Villella's question to Bomba (in Karlavage's presence) as to why she takes Klonopin – thereby improperly eliciting information about Bomba's disability (in the presence of her co-worker no less) . . . – constitutes an improper disability-related inquiry prohibited by the ADA and RA." (Id.). Plaintiff thus argues that a jury could find that "Defendant Villella's specific inquiry about the reason for Bomba's Klonopin use was designed to – and did – illicit [sic] disclosure of Bomba's disability and exceeded the scope of permissible inquiries under the ADA and RA." (Id.).

Plaintiff's objection is sustained in part and overruled in part as hereinafter explained. Defendants' Statement of Material Facts (Doc. 25) and Plaintiff's response thereto (Doc. 48) show that it is undisputed that, after Bomba tested positive three times via ion scanning,

Defendant Ellett asked Bomba "if she was taking anything." Plaintiff told her that she took Klonopin and an antibiotic. (Doc. 25, at ¶ 24). An attempt was made by Nursing Supervisor Silva to determine if any other drug would present or "react" as the date rape drug for which Plaintiff had tested positive. Silva informed Defendant Ellett and Bomba that he could not find anything that would react as the date rape drug during testing. (Id. at ¶ 25). Thereafter, Bomba, along with employee Karlavage, were accompanied by Lieutenant Villella to his office. (Id. at ¶ 29). Initially, after arriving at his office, Villella told Bomba and Karlavage that each had to fill out paperwork, including consent forms. (Id. at ¶ 31). Bomba filled out the first page of the Determination of Reasonable Suspicion packet and handed it back to Villella who proceeded to fill out the paperwork. (Id. at ¶ 32). When Villella reached page four of the six pages of paperwork, he asked aloud the question set forth there: "Is there any medication you are supposed to be taking?" (Id. at ¶ 33). Plaintiff responded "I'm not really comfortable talking about that." (Doc. 25, at ¶ 34). Villella then instructed Bomba and Karlavage to write their medications down on their respective forms. (Id. at ¶ 35). Bomba wrote down several medications including Klonopin and returned the form to Villella. (Id. at ¶ 36). Villella then asked Plaintiff aloud "what's this Klonopin" and "what's that for," to which Plaintiff responded "anxiety." Villella then asked Plaintiff why she took Klonopin and Plaintiff responded "I have a hard time with my mom since she died." (Id. at ¶ 37).

It is further undisputed that Defendant Villella did not conduct the reasonable suspicion inquiry with Bomba in order to send her to the hospital for a urine test. Rather, he

conducted the reasonable suspicion inquiry to determine if she was fit for duty to return to

work pending the results of her urine test. (*Id.* at ¶ 41). Villella did conclude that Bomba was

fit to return for duty. (*Id.* at ¶ 42). It is likewise undisputed that "Defendant Villella used the

Determination of Reasonable Suspicion form to determine whether Plaintiff was fit for duty

because it was the only tool he had to use to assess fitness for duty." (*Id.* at ¶ 43).

The ADA expressly provides that a covered entity "shall not make inquiries of an

employee as to whether such employee is an individual with a disability or as to the nature

or severity of the disability unless such examination or inquiry is shown to be job-related and

consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Here, the record supports

the Magistrate Judge's determination that:

> There is no evidence to dispute Villella's assertion that he made these
> inquiries in an effort to determine the legitimacy of the positive ion scan and
> whether Bomba was fit to return to duty. Questioning Bomba about her
> prescription medications for these purposes falls squarely under the business
> necessity exception and is not unnecessarily instrusive given Villella's role on
> the security team and in light of Bomba's ion scan, as determining the
> potential cause of Bomba's positive scan was clearly "vital" to prison safety
> and security.

(Doc. 51, at 43).

However, as for Defendant Villella having questioned Bomba in front of employee

Karlavage, Plaintiff has submitted evidence to show that she suffered emotional harm as a

result of Karlavage's presence during Villella's questioning of her regarding her use of

Klonopin. In *Tice v. Centre Area Transportation Authority*, the Third Circuit, in the context of

a claim by the plaintiff that the District Court erred in granting summary judgment to his

employer "regarding his claim for damages in light of CATA's admitted violation of those ADA provisions governing the confidentiality of medical records," stated:

> Other courts of appeals have addressed the question whether a plaintiff has a cause of action for a violation of § 12112(d) without demonstrating the existence of an injury-in-fact, either through actual damage (emotional, pecuniary, or otherwise), or through the presence of a continuing illegal practice to which plaintiff is likely to be subject absent court intervention. All have concluded that a violation of § 12112(d), without such a showing, presents no "injury" capable to remedy, and thus affords no basis for suit.

247 F.3d 506, 520-521 (3d Cir. 2001).

Here, there is a genuine dispute of fact for trial as to whether Villella's questioning of Bomba in the presence of another employee, Karlavage, was necessary and justified by legitimate business related reasons or valid penological concerns.

Plaintiff's objection will therefore be sustained in part and her claims under 42 U.S.C. § 12112(d)(4) in Counts I and II, as limited herein, will proceed to trial.

Plaintiff next objects to the Magistrate Judge's determination that she has not produced sufficient evidence "to establish a causal connection between the filing of her EEOC charge and [defendant] Ellett's decision to pass her over for the Acting Unit Manager positions" and by declining to recognize that "knowledge of a protected activity can be imputed to the decision maker merely by sending a letter to the employer's central office." (Doc. 55, at 9).

Plaintiff, in support of her objections, points to evidence in the record that she had more experience than the two other employees who were selected by Defendant Ellett for the Acting Unit Manager positions.

Specifically, Bomba cites to her deposition testimony to argue that Heather Bognatz, who received the Unit 1 Acting Unit Manager position, and Serena Biko, who received the Unit Four Acting Unit Manager position, each had facilitated fewer sex offender groups than Bomba. Plaintiff argues that she has facilitated "at least 39 sex offender programs, whereas Biko has facilitated four and Bognatz has not facilitated any sex offender groups." (*Id.*).

Bomba also argues that her work with sex offenders on Unit 1 would be an advantage to serving as Acting Unit Manager there and that her supervisor, Grillo, recommended Bomba for the Unit Manager position in a meeting with DelRosso, Ellett, and Gavin when he was asked if he had a recommendation as to who could replace him in the Unit Manager position. (*Id.*). She further argues that Grillo recommended her for doing and knowing her job very well and for her familiarity with the population for which she would be responsible in Unit 1. She further notes that Grillo characterized her as "a very good fit" and "exceptional". (*Id.*).

Plaintiff also cites to Grillo's deposition wherein she asserts that Grillo, after recommending her as his first choice, recommended Dave Gorman and Heather Bognatz, with Bognatz being Grillo's last choice. (*Id.* at 10) (citing Dep. of Grillo, at 46, 48-49).

Additionally, Bomba cites to the deposition of Gavin, stating that Bomba could have "absolutely" served as Acting Unit Manager. (Doc. 55, at 10).

Thus, Bomba argues that "[a]gainst this evidence a jury could reasonably discredit Defendant Ellett's testimony that she relied on the Rule of Three in filling the positions (Doc. 51 at 35-36)." (*Id.*).

Defendants, in response, argue that Plaintiff "wholly ignores the lack of temporal proximity, the lack of a pattern of antagonism, and the lack of notice of protected activity, instead listing self-serving qualifications as proof that retaliation must have occurred." (Doc. 59 at 10).

Defendants set forth succinctly their argument as to Plaintiff's retaliation claim:

> Furthermore, there is no causal link. Temporally, the first Acting Unit Manager job did not become available until mid-October 2015, over five months after the complaint, and the second acting job did not open until seven months later. (SMF ¶ 70). Third Circuit precedent is clear that "[t]he adverse action must occur within days, not months, of the protected activity." *Mercer v. SEPTA*, 608 F.App'x 60, 65-66 (3d Cir. 2015); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 873 F.2d. 701, 708 (3d Cir. 1989) (holding that a span of two months between the protected ADA activity and the adverse employment action was not enough to find a causal link); *compare Jalil v. Avdel Corp.*, 873 F.2d 701, 707-08 (3d Cir. 1989) (finding two days to be sufficient).

(*Id.* at 10-11).

In *Williams v. Philadelphia Housing Authority Police Department,* the Third Circuit identified precisely what a plaintiff must do to establish a *prima facie* case of illegal retaliation:

"[I]n order to establish a *prima facie* case of illegal retaliation under the anti-discrimination statutes, a plaintiff must show: '(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.'" *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

380 F.3d 751, 759 (3d Cir. 2004).

The Court in *Williams* affirmed the District Court's determination that Williams' termination, which occurred over two months after his request for an accommodation, "was not suggestive of a causal connection between Williams's request for accommodation and termination." *Id.* at 759-760. In explaining its decision, the Court made clear that the use of temporal proximity to support inferentially the existence of a causal link between protected activity and retaliatory conduct must be "unusually suggestive." Thus, it stated:

> We have held in the ADA retaliation context that "temporal proximity between the protected activity and the termination [can be itself] sufficient to establish a causal link." *Shellenberger*, 318 F.3d at 183 (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)) (internal quotation marks omitted). However, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Shellenberger*, 318 F.3d at 189 n. 9 (quoting *Krouse*, 126 F.3d at 503) (internal quotation marks omitted). For example, two days between the protected activity engaged in and the alleged retaliation sufficed in *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), to support an inference of a causal connection between the two. Similarly, in *Shellenberger*, comments made by a supervisor suggesting retaliation ten days before termination, along with other evidence of retaliation, were sufficient to establish a *prima facie* showing of causation. *Shellenberger*, 318 F.3d at 189.
>
> Here, over two months elapsed between the time Williams requested a radio room assignment and the time that he was terminated. In cases like this one, "where 'the temporal proximity is not so close as to be unduly suggestive,' we

19

have recognized that 'timing plus other evidence may be an appropriate test....'"

*Id*. at 760.

The decision in *Williams* has been consistently followed in this Circuit. For example,

in *Leboon v. Lancaster Jewish Community Center Association,* 503 F.3d 217 (3d Cir. 2007)

the Court observed:

> We consider "a broad array of evidence" in determining whether a sufficient causal link exists to survive a motion for summary judgment. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). Where the temporal proximity between the protected activity and the adverse action is "unusually suggestive," it is sufficient standing alone to create an inference of causality and defeat summary judgment. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (temporal proximity alone, when "very close," can in some instances establish a prima facie case of retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (reversing summary judgment in favor of the defendant where plaintiff had been discharged two days after his employer's receipt of his EEOC claim). Where the temporal proximity is not "unusually suggestive," we ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell*, 206 F.3d at 280 (internal citation and quotation marks omitted). Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Id*. at 279-81. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").
>
> Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment. *See Clark County School Dist.* 532 U.S. at 273, 121 S.Ct. 1508 (citing favorably *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997), which rejected such an inference where the events were

three months apart); *Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five-month time period between employee's complaint and first adverse action was, without additional evidence, insufficient to raise an inference of causation).

503 F.3d at 232-233.

Accordingly, the Magistrate Judge correctly determined here that where five months passed between the filing of Bomba's EEOC charge and the first Acting Unit Manager position becoming available, there is insufficient temporal proximity to establish causation.

In addition, Plaintiff has failed to come forward with additional evidence which would allow her to support her claim of retaliation by showing any intervening antagonism between her and Defendant Ellett who she alleges retaliated against her by not assigning her the Acting Unit Manager positions.

On review of the record, there is scant evidence showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d. Cir. 1994).

Plaintiff does not dispute that she did not submit an application for the Acting Unit Manager positions nor did she express interest in the job to Defendant Ellett (Doc. 25, ¶ 76).

While Plaintiff admits the testimony of Defendant Ellett that she used the "Rule of Three" in filling the October and December 2015 Acting Unit Manager jobs, Plaintiff limits her admissions of these facts by asserting that she admits the accuracy of Ellett's testimony on these matters but not their truth. And, indeed, had Plaintiff come forward with sufficient facts suggesting a dispute for trial as to Ellett's credibility on these matters, summary

21

judgment would be inappropriate. But here, Plaintiff has not come forward with any facts suggesting that some reasonable basis exists in the record to call into question Ellett's testimony with respect to the manner in which she filled the Acting Unit Manager positions.

Finally, on this issue, Plaintiff has not come forward with evidence of record creating a dispute for trial as to whether Ellett knew of the charge of discrimination which Bomba filed with the EEOC. Likewise, as the R&R notes, and as is the case before this Court, Plaintiff has provided no case law in this Circuit for the proposition that knowledge of Plaintiff's filing of a charge of discrimination with the EEOC may be imputed to Ellett.

However, even if this Court were to assume that Ellett had constructive notice of Bomba's EEOC charge because copies were sent to the DOC at the time the charge was filed, the absence of sufficient temporal proximity between the filing of the charge and distribution of copies of it and the assignment of Bognatz and Biko to the Acting Unit Manager positions instead of Bomba in October and December of 2015 as well as the absence of any evidence of antagonism or hostility as between Bomba and Ellett in the intervening time period, requires that Plaintiff's objection to the R&R on this issue be denied. Accordingly, the recommendation set forth in the R&R that Defendants be granted summary judgment on Count III of Plaintiff's Complaint will be adopted.

Next, Plaintiff objects to the Magistrate Judge's recommendation that the individual Defendants are entitled to qualified immunity with respect to her constitutional deprivation claims in Counts V, VI, and VII.

Upon review of the R&R, the general principles regarding the application of qualified immunity are correctly cited and stated. (*See e.g.,* Doc. 51, at 21-24). When considering Bomba's specific constitutional claims, however, the R&R overstates the scope of Bomba's claims, and in so doing, finds them unsupported by sufficient case law establishing Plaintiff's claim as arising under clearly established constitutional law. Thus, with respect to Bomba's claim of privacy in her medical information, the R&R states "[b]ecause Bomba has found no case law holding that prison officials violate a constitutional right to privacy by disclosing a prison staff member's medical information and prescriptions after a positive ion drug scan, we find that it is not sufficiently clear that any conduct on the part of the defendants with respect to the disclosure of Bomba's prescriptions and medical information violated her clearly established constitutionally-protected right to privacy." (Doc. 51, at 25-26).

Similarly, with respect to Bomba's claim of privacy with respect to the results of the ion screening she underwent as well as her urinalysis testing, the R&R concludes "[b]ecause Bomba is unable to point to any case law holding that a prison staff member's privacy interest in the results of an ion or drug scan is not outweighed by prison officials' interest in ensuring the safety and security of the prison by maintaining a drug-free facility, we find that the defendants have not violated any clearly-established constitutional rights with respect to their disclosure of Bomba's ion scan results." (*Id.* at 27).

In addition, with respect to Bomba's claim of a violation of her right to privacy in connection with the manner in which she was required to provide a urine specimen, the

R&R characterizes the passages in the cases cited by Plaintiff as "musings in *dicta*" and then concludes that those cases do not establish that "Banta violated Bomba's clearly established constitutional rights when she directly observed Bomba provide her urine sample." (*Id.* at 28).

Plaintiff, in her objections, first correctly states that the Third Circuit recognized a constitutional right to privacy in a public employee's prescription drug records in *Doe v. Southeastern Pennsylvania Transportation Authority,* 72 F.3d 1133 (3d Cir. 1995). (Doc. 55, at 11-12). In *Doe*, the Court, citing *Whalen v. Roe*, 429 U.S. 589 (1977), recognized that the right to privacy

> encompasses two separate spheres. One of these is an individual's interest
> in independence in making certain decisions. The other is an interest in
> avoiding disclosure of personal information. *Whalen*, at 599-600, 97 S.Ct. at
> 876-877. Medical records fall within the second category. *Id.* Therefore, the
> [*Whalen*] Court held that individuals do have a limited right to privacy in their
> medical records.

72 F.3d at 1137-1138.

Plaintiff recognizes that this right is "not absolute" and that as stated in *Doe v. SEPTA,* "the right to privacy in one's prescription drug records must be balanced against important competing interests." (Doc. 55, at 12)(quoting *Doe*, 72 F.3d at 1138). Plaintiff also recognizes that as stated in her brief in support of her objections, the Court in *Doe v. SEPTA* "found that since the prescription drug information in question was disclosed 'only for the purpose of monitoring the plans by those with a need to know,' the employer's need for access to the information outweighed the employees' interest in keeping prescription

24

drug purchases confidential. [*Doe*, 72 F.3d] at 1143." (Doc. 55 at 12-13). Accordingly, this Court agrees with Plaintiff's statement that "a constitutional right to privacy in an individual's prescription drug records exists and was clearly established as of the date of Bomba's ion scan." (Doc. 55, at 13).

Moreover, the Court does not adopt the analysis of the R&R wherein qualified immunity is recommended in connection with Plaintiff's claims under Counts V, VI, and VII on the basis that Bomba's right to privacy in her medical records and drug prescriptions as limited in *Doe v. SEPTA, supra,* has no application because Bomba is an employee of a prison. This reasoning cannot be reconciled with *Doe v. Delie,* 257 F.3d 309 (3d Cir. 2001).

In *Delie*, the Court rejected the District Court's determination that the Appellant, an HIV-positive inmate, had no right to privacy in his medical information because such a right does not exist in prison. *Delie*, 257 F.3d at 315. To this assertion, the Court stated flatly: "[w]e disagree". *Id.* The Court then recognized a prisoner's right to privacy in his medical information and joined the Second Circuit "in recognizing that the constitutional right to privacy in one's medical information exists in prison." *Id.* at 317.

The Court in *Delie* was careful to point out that a prisoner's right of privacy in his medical information was not the same as a "free citizen", and that the right was "subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Id.* The Court emphasized that "an

inmate's constitutional right may be curtailed by a policy or regulation that is shown to be 'reasonably related to legitimate penological interests.'" *Id.*

Manifestly, the decision in *Doe v. Delie* addressed an inmate's right of privacy in his medical information rather than that of a prison employee. And equally clear, the Court limited an inmate's right to medical privacy "subject to legitimate penological interests." [4]

In light of the Court's ruling in *Doe v. Delie* that a constitutional right to privacy as limited therein exists for prison inmates, it can hardly be denied that a right to privacy exists for prison employees as limited by such restrictions and limitations "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987).

And indeed, in her brief in support of her objections, Plaintiff recognizes the narrowness of the claim she may make of a constitutional violation:

> While Defendants may have a legitimate interest in obtaining information about an employee's medication use in connection with their drug and alcohol program which arguably can be disclosed to security personnel, medical staff, and the employee's supervisors, importantly Bomba is not challenging this broad interest; her claims in Count V arise from the unauthorized and unwarranted disclosures by Defendants Villella and Soden of her prescription drug use to Bomba's co-workers who have no security responsibilities and are outside her chain of command.

(Doc. 55, at 13-14)(underlining in original).

---

[4] The Court in *Doe v. Delie* found that the right to privacy was not clearly established at the time of the Defendants' conduct in 1995, the period of Doe's claims of constitutional violations, and affirmed the District Court's dismissal of Doe's complaint on the basis of qualified immunity. For purposes of analysis in this case, it is the Court's ruling in 2001 that a right to privacy in one's medical records "exists in prison," 257 F.3d at 317, that is significant.

Thus, Bomba claims that the manner in which the ion scan was conducted violated Section 7(C)(3)(c) of the Drug Interdiction Manual, which provides: "All scanning of employees shall be conducted in a private secure area to afford complete privacy." Bomba likewise asserts that Defendants' use of the Alternate Shift Commander's Office "with the door open and within sight and earshot of other employees waiting in the Muster Room to be scanned, does not comply with this policy." (Doc. 48, at ¶ 9). Plaintiff testified that she "wasn't okay with everybody hearing in the muster room that [she] tested positive for the date rape drug." (Dep. of Bomba, Vol. I, Doc. 27-2, at 147:17-18).

Bomba also testified that when she left the Muster Room, she and Defendant Banta walked to Defendant Ellett's office to meet with her. (Id. at 136:10-14). She testified that the door was open to Defendant Ellett's office and that two inmates delivering mail, Jameson and White, one of whom was in her sex offender group, were in the hall outside of Ellett's office at the time that Defendant Banta said "Denise was scanned and tested positive for the date rape drug." (Id. at 136:16-137:22; 141:4-5). At that time Bomba rose and shut the door. (Id. at 137:23-25). Plaintiff testified that she did not know how inmate Jameson could not have heard the discussion in Ellett's office when the door was open. (Id. at 141:7-16). Bomba also testified that as she was leaving Ellett's office, a staff member, Alice Emmett, grabbed her arm and whispered "I didn't know you were a party girl" and "kind of chuckled and kept walking." (Id. at 150:10-15)

27

Bomba further testified that she was taken to the Superintendent's office along with employee Joseph Karlavage, Defendant Ellett, Deputy Superintendent Delrosso, and Defendant Banta. While in the room, Defendant Villella entered and according to Plaintiff's testimony, told her that he made Lieutenant Smith aware that she had tested positive for the date rape drug and that Smith had responded "now it makes sense how Eddie got a girl like her, he had to drug her." Villella thus repeated Lieutenant Smith's comment to Plaintiff, according to her testimony. (Id. at 150:16-151:21).

Plaintiff also testified that she was taken to Lieutenant Villella's office along with Mr. Karlavage. In that meeting, Bomba told Villella that she was not comfortable "saying my medications out loud." (Id. at 164:18-23). At that point, Villella told Plaintiff to write her medications on a sheet of paper on which she then wrote Klonopin, Flexeril, and other medications. (Id. at 165:13-15). Plaintiff testified that Defendant Villella reviewed the paper and asked her in the presence of employee Karlavage, "What's this Klonopin." (Id. at 166:13-16).

Bomba also testified that on July 21, 2014, Defendant Soden raised the issue of her use of Klonopin with her, commenting that "everything worked out for you" to which Plaintiff testified she responded "I don't know. I don't know." Soden then, according to Plaintiff, said "well, you said that you're on Klonopin, right?" (Dep. of Bomba, Vol. II, Doc. 28-1 at 68:2-7). Bomba testified that Soden then started following her as she walked with a male employee named Delaney and that Defendant Soden continued to talk about the Klonopin issue in the

28

presence of Delaney and other officers. (*Id.* at 68:8-25). She testified that Defendant Soden

kept talking in the presence of Delaney and another officer, Yadlosky, which she testified

made her "very upset that he mentioned my medication in front of me." (*Id.* at 69:3-25). In

addition, Plaintiff testified that inmate Jameson, who had been outside of Deputy Ellett's

office, apologized for having overheard the conversation when he was outside of the office.

(*Id.* at 76:5-77:11).

Given the existence of a constitutionally recognized right of privacy which extends to

prison employees but which must be subject to "substantial restrictions and limitations in

order for correctional officials to achieve legitimate correctional goals and maintain

institutional security," *Delie, supra,* 257 F.3d at 317, Bomba's testimony as to the lack of

privacy in connection with the ion screening of employees, the open door of Defendant

Ellett's office during the discussion of her positive test for the date rape drug, the loud

announcement of Plaintiff having tested positive for the date rape drug, as well as Villella's

questioning of Bomba regarding her use of Klonopin in the presence of another employee,

Karlavage, and the disclosure of her use of Klonopin by Defendants Villella and Soden to

other corrections officers who may or may not have had the need to know such information,

presents genuine disputes for trial as to whether Plaintiff's constitutional right to privacy was

violated. In particular, the manner in which the ion scanning was conducted as well as the

manner in which Plaintiff was questioned regarding her use of Klonopin and the manner in

which she was required to submit to urinalysis in the presence of Defendant Banta present

issues for trial with respect to whether such conduct, if a jury finds it occurred, is nonetheless justified by business necessity or "reasonably related to legitimate penological interests," *Turner v. Safley, supra*, 482 U.S. at 89. Therefore, the R&R's recommendations that qualified immunity be granted to Defendants in Count V and VI are not adopted.

In addition, for the reasons stated here as well as the reasons which follow, the recommendation of the R&R that the Defendants in Count VII be granted qualified immunity is likewise not adopted. The R&R recommends that qualified immunity be granted with respect to Defendants in Count VII because "the facts surrounding Banta's observation of Bomba as she provided her urine specimen differ significantly from the cases cited by Bomba in that SCI Waymart staff had reasonable suspicion to conduct a more intrusive urinalysis because Bomba already tested positive on her ion scans, whereas the cases cited all involved suspicionless testing." (Doc. 51, at 28). On this basis, the R&R seeks to justify direct observation of Bomba's act of urination by stating that "taking additional security measures to ensure the integrity of the urine test was a prudent and appropriate course of action." (*Id.*). However, upon review of the record, such a distinction appears unjustified as nothing in the record indicates that the Defendants had any reason or basis to believe that Bomba, in providing her urine sample, was someone who would adulterate the specimen or who would not honestly comply with the providing of her own urine.

In addressing the issue of qualified immunity, the R&R states: "we are unwilling to presume that what might be considered an impermissible intrusion into privacy outside

30

prison walls is also unconstitutional in a prison setting." (*Id.* at 25). Wholly apart from the fact that Bomba's urinalysis test was conducted at Wayne Memorial Hospital, and not at SCI Waymart, a more fundamental flaw in the R&R's reasoning is its lack of observance of the Third Circuit's admonitions in *Wilcher v. City of Wilmington*, 139 F.3d 366 (3d Cir. 1998).

In *Wilcher*, the Circuit reviewed the method of testing the City of Wilmington's firefighters for drug use to determine if that method violated their constitutional rights. The plaintiffs contended that the direct observation method of urine collection violated the firefighters' rights under the Fourth Amendment, as incorporated by the Fourteenth Amendment, to be free from unreasonable searches and seizures. The District Court first granted summary judgment in favor of the individual defendants on the basis that they were entitled to qualified immunity and in favor of the drug testing company, SODAT, on the ground that it was not a state actor. The Court then held a three-day trial, but before its conclusion, the Court determined that under *Bolden v. SEPTA*, 953 F.2d 807, 822-823 n.23 (3d Cir. 1991), "reasonableness" under the Fourth Amendment was an issue of law. The District Court then determined that there were no remaining factual issues for the jury to decide, dismissed the jury with the Plaintiffs' "acquiescence" and decided the case against Plaintiffs, concluding that the direct observation of urine collection was reasonable under the Fourth Amendment. *Wilcher*, 139 F.3d at 370.

On appeal, the firefighters contended that the direct observation method of urine

collection violated their rights under the Fourth Amendment. The Court began its analysis

by stating:

> It is well established that the government's collection and testing of an employee's urine constitutes a "search" under the Fourth Amendment. *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989); *Treasury Employees v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390-91, 103 L.Ed.2d 685 (1989). Ordinarily, the Constitution requires the government to obtain a warrant supported by probable cause to search a person or his property. There are, however, several well-established exceptions to the warrant and probable cause requirements. The Supreme Court has explained:
>
> > [O]ur cases establish that where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.
>
> *Von Raab*, 489 U.S. at 665-66, 109 S.Ct. at 1390-91. *See also Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). Under the "special needs" analysis, the government need not show probable cause or even individualized suspicion for its search. Instead, it must prove that its search meets a general test of "reasonableness." Under this standard, the constitutionality of a particular search "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (*quoting Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). In particular, the Supreme Court's jurisprudence directs us to consider three factors when judging the constitutionality of employee drug tests: (1) the nature of the privacy interest upon which the search intrudes; (2) the extent to which the search intrudes on the employee's privacy; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by

the government for meeting that concern. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

*Id.* at 373-374.

The firefighters claimed on appeal that monitors looked at their genitalia as they urinated. *Id.* at 375. However, the Court, having accepted the District Court's findings of fact as accurate, stated:

> Based on the evidence before it, the trial court concluded that SODAT's drug testing procedure involved only the monitors' direct observation of the urine collection process in general and not the intentional observation of the firefighters' genitalia. *Wilcher*, 924 F.Supp. at 617-18. We accept as accurate the district court's finding of fact concerning the nature of the urine collection process employed by SODAT. Although the reasonableness of a search is a legal question, the particular *character* of that search is a factual matter. *Cf. O'Connor v. Ortega*, 480 U.S. 709, 726-729, 107 S.Ct. 1492, 1502-04, 94 L.Ed.2d 714 (factual dispute regarding character of search precluded lower court's grant of summary judgment on Fourth Amendment issue). As such, the trial judge's factual finding regarding the character of SODAT's drug testing procedure is reversible only if it is clearly erroneous. *See Marco v. Accent Pub. Co., Inc.*, 969 F.2d 1547, 1548 (3d Cir. 1992). In light of the nature of the testimony from the SODAT employees, which the trial judge chose to credit, we cannot say that the district court's finding was clearly erroneous. Consequently, we will adopt the district court's description of the SODAT procedure as one which entails only incidental observation of a firefighters' genitals.

*Id.* at 375 (italics in original).

The Circuit made clear that with respect to male firefighters, "[i]n a world where men frequently urinate at exposed urinals in public restrooms, it is difficult to characterize SODAT's procedure as a significant intrusion on the male firefighters' privacy." *Id.* at 376. The Court emphasized that the monitors in the case before it, like those in *Vernonia, supra,*

33

"stand behind the individual providing the urine specimen," and "observe only the collection process generally and not the particular individual's genitalia." *Id.* They thus found this procedure not unreasonable.

Nonetheless, the Court added that it was "more cautious about the reasonableness of the direct observation method as it applies to female firefighters," adding "[w]e simply cannot characterize the presence of a monitor in a bathroom while a female urinates as an ordinary aspect of daily life." *Id.* Moreover, in a footnote, the Court observed:

> We note that our conclusion might differ had the District Court accepted the firefighters' testimony that SODAT's monitors looked over firefighters' shoulders as they provided their urine specimens. Similarly, we would be much more concerned with a procedure's intrusion on privacy if it required the monitor to stand in front of the firefighter, or if it demanded the direct observation of the firefighter's genitalia.

*Wilcher*, 139 F.3d at 376 n.6. However, noting that the District Court in *Wilcher* "found that the female monitors stood to the side of the female firefighters and that the monitors did not look at the firefighters' genitalia as they urinated, but rather in their general direction," the Court found that the intrusion, although significant on the female firefighters' privacy, was nonetheless carried out "in an appropriate and professional manner." *Id.* at 377.

The Court concluded its affirmance of the District Court's ruling finding the method of urine testing constitutionally proper with the following admonition:

> So long as SODAT's monitors refrain from looking at the firefighters' genitalia, its direct observation procedure remains within the boundaries of a constitutional search.

*Id.* at 378.

34

In this case, the issues before this Court may be resolved based on established Supreme Court and Third Circuit precedent as discussed in *Wilcher*. As such, the recommendation for the grant of qualified immunity to the Defendants as to Count VII is not adopted. The direction of the Circuit in *Wilcher* could not be more clear. Those who monitor by direct observation the providing of a urine sample for drug testing must "refrain from looking at the [employee's] genitalia."

In this case, Bomba has testified, not inconsistent with Statement of Material Fact ¶ 57 (Doc. 25), that Defendant Banta, while in the bathroom with Plaintiff, looked at the Plaintiff's "private area" while she was urinating and that Banta did so for the entire period of time it took Bomba to complete urination. (Dep. of Bomba, Vol. II, Doc. 28-1, at 25:4-28:18). An excerpt of that testimony is as follows:

> **Q**: And then it's your testimony at some point she looked down to your private area to see you urinating?
>
> **A**: Yes.
>
> **Q**: How long was she looking down at your private area?
>
> **A**: As long as it took me to finish.
>
> **Q**: So she was looking at your private area while you were urinating?
>
> **A**: Yes.

(*Id.* at 28:9-18).

Banta, for her part, when deposed, denied looking at Plaintiff when she provided her urine sample:

**Q**: Were you looking at her while she provided her sample?

**A**: I was not.

(Dep. of Banta, Doc. 37-1 at 71:8-10; *see also, id.* at 71:21-24). It also bears noting that Banta testified that she had no reason to suspect that Bomba had tampered with the urine sample. (*Id.* at 74:1-7).

Thus, there exists a genuine dispute of fact as to the method under which Bomba provided a urine sample and how this sample was taken. Accordingly, under the law established in *Wilcher*, the recommendation that qualified immunity be granted to the Defendants with respect to Count VII is not adopted.

The analysis undertaken in the R&R, pursuant to which the Magistrate Judge recommended that qualified immunity be granted in Counts V, VI and VII, is not in accord with the most recent appellate decisions in this circuit regarding the principles governing the grant or denial of qualified immunity. For example, in *Kane v. Barger*, 902 F.3d 185 (3d Cir. 2018), the Court reversed the grant of qualified immunity to a police officer who, in the course of investigating a potential sexual assault, violated the bodily integrity of the sexual assault victim. The Court distilled from Supreme Court precedent the following principles for determining qualified immunity and, specifically, for determining when a constitutional right may be deemed clearly established:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. "We do not require a case directly on point" to find that a right was clearly established. Rather, "[t]o be clearly established," a right need only

have "a sufficiently clear foundation in then-existing precedent." In this inquiry, "[w]e look first to applicable Supreme Court precedent." However, "[e]ven if none exists, it may be possible that a robust consensus of cases of persuasive authority in the Courts of Appeals could clearly establish a right for purposes of qualified immunity."

"Defining the right at issue is critical to this inquiry," and "[w]e must frame the right in light of the specific context of the case, not as a broad general proposition." This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Accordingly, "it need not be the case that the exact conduct has previously been held unlawful so long as the contours of the right are sufficiently clear." Said another way, we do not require a case "directly mirror[ing] the facts" at hand, so long as "there are sufficiently analogous cases that should have placed a reasonable official ... on notice that his actions were unlawful." As such, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."

902 F.3d at 194-195.

Thus, the decision in *Kane* leaves no question that a "case directly on point" is not required in order to find that a constitutional right was clearly established. Here, ample precedent exists to require the denial of qualified immunity and allow Plaintiff's claims in Counts V, VI and VII to be submitted for trial.

The Court next turns to Defendants' objections to the R&R.

## 2. Defendants' Objections

The Defendants first object to the Magistrate Judge's denial of summary judgment to Defendants Villella, Soden, the DOC and SCI-Waymart with respect to Counts I and II of the Amended Complaint. Defendants also request, alternatively, that supplemental briefing should be permitted in accordance with the suggestion set forth in the R&R. This issue has

been addressed in connection with Plaintiff's objections and, having been resolved there by this Court's denial of supplemental briefing, that issue will not be again addressed.

With respect to the claims against Defendants Soden and Villella that they improperly disclosed Bomba's confidential medical information in violation of 42 U.S.C. §12112(d)(4)(C), Defendants first acknowledge that "Section 12112(d)(4)(C) provides that information regarding 'the medical condition or history of any employee' obtained under Section 12112(d)(4)(B) is to be treated as confidential.'" (Defs.' Br. in Supp. of Objs., Doc. 57, at 7). On that basis, Defendants argue that "the applicability of Section 12112(d)(4)(C) hinges on Section 12112(d)(4)(B)." That Section states:

> A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job related functions.

42 U.S.C. § 12112(d)(4)(B). Defendants correctly point out that "there is no argument that this case implicates employee health programs." (Doc. 57, at 7). Accordingly, Defendants state that the question presented before this Court "is whether the actions of Villella and Soden fall within the second sentence of the foregoing provision." (*Id.*).

Defendants then take issue with the R&R wherein Judge Carlson, in determining that Villella and Soden's actions fell within the second sentence of Section 12112(d)(4)(B), wrote that "Villella and Soden . . . appear to have learned of Bomba's Klonopin use through performing a Reasonable Suspicion evaluation, in which Villella was assessing whether Bomba was fit to return to duty." (*Id.* at 8) (quoting Doc. 51, at 46). In response to this

38

determination, Defendants argue that Bomba makes no such allegation and that there is no evidence of record that "Soden had anything to do with the reasonable suspicion determination. Rather, Soden learned that Bomba is prescribed to Klonopin because he found the Klonopin during a car search for contraband." (Doc. 57, at 8). Defendants thus argue that because Soden did not learn of the confidential medical information through conducting an inquiry into Bomba's ability to perform job related functions, "his comment in the hallway cannot violate Section 12112(d)(4)(C)." (Id.). In addition, Defendants argue that Defendant Soden is not a supervisor and Plaintiff has failed to present case law to support the proposition that Soden can constitute the "employer" for purposes of Section 12112(d)(4)(C).

In response, Bomba submits that "[b]ecause Defendant Soden was a member of Defendant SCI Waymart's security team and his actions were part and parcel of the follow-up to Bomba's positive ion scan and Defendants' subsequent inquiry into her fitness for duty, the Magistrate Judge correctly interpreted Defendant's [sic] Soden's role as participating in the inquiry into Bomba's ability to perform job-related functions." (Pl.'s Br. in Opp. to Defs.' Objs., Doc. 58, at 10-11).

This Court adopts the Magistrate Judge's reasoning that both Villella and Soden learned of Bomba's Klonopin's use through a reasonable suspicion evaluation, which under the Drug Interdiction Procedural Manual is an authorized part of the procedures to be followed when there is reasonable suspicion due to a positive drug reaction to drug

interdiction equipment. (*See* Drug Interdiction Procedural Manual, § 5(D)(4))("A positive reaction to electronic drug detection equipment or K-9 team may constitute grounds for searching an employee's personal property and vehicle in accordance with Department policy 6.3.1, 'Facility Security.'"). The Court further agrees with the statement set forth in the R&R that "[a] juror could find that this Reasonable Suspicion evaluation constituted an inquiry into Bomba's ability to perform job-related functions. *See* 42 U.S.C. Section 12112(d)(4)(B)." (Doc. 51, at 46).

As for whether Defendant Soden is a "supervisor", his status is at issue and, in any event, his membership on the security team charges him with responsibility in connection with the reasonable suspicion testing procedures set forth in the Drug Interdiction Procedural Manual.

On these bases, therefore, Defendants' first objection will be overruled.

Defendants' second objection asserts that Plaintiff did not properly plead or raise a violation of Section 12112(d)(4)(C) in that, Defendants assert, Plaintiff has maintained that the confidential information which Plaintiff alleges was disclosed by Villella and Soden was information obtained in violation of Section 12112(d)(4)(A) and not in violation of Section 12112(d)(4)(B). Thus, Defendants argue that Plaintiff has failed to plead a claim of a violation of Section 12112(d)(4)(B) and that, accordingly, her reliance upon Section 12112(d)(4)(C) to support her claims against Defendants Villella and Soden must fail because "[t]hough she mentions Section 12112(d)(4)(C), she never claims that any inquiries

40

were made, or information obtained, pursuant to Section 12112(d)(4)(B) governing,

'Acceptable examination and inquiries.'" (Doc. 57, at 10-11). Plaintiff responds that "[b]y its

express language, Section 12112(d)(4)(C) incorporates by reference Section

12112(d)(4)(B)." (Doc. 58, at 7). Indeed, Plaintiff, in paragraph 111 of her Amended

Complaint, alleges that the Defendants

> engaged in unlawful practices against Plaintiff in violation of Title I of the ADA,
> 42 U.S.C. Section 12112(a), (d) in the following ways and as outlined more
> fully above: . . .
>    c. by improperly disclosing Plaintiff's confidential medical information, in
>    violation of the ADA, 42 U.S.C. § 12112(d)(4)(C).

(Doc. 18, at ¶ 111).

Section 12112(d)(4)(C) makes information obtained under Section 12112(d)(4)(B)

subject to the requirement set forth in Section 12112(3)(B) that such information must be

treated as a confidential medical record subject to certain exceptions set forth in that

subsection.

Both parties appear to agree that Section 12112(4)(B) permits a "covered entity" to

make "inquiries into the ability of an employee to perform job related functions." (See Doc.

57 at 7)(quoting 42 U.S.C. § 12112(d)(4)(B)). Thus, the Court agrees that "the question is

whether the actions of Villella and Soden fall within the second sentence of the foregoing

provision." (Id.). Neither party has argued or otherwise asserted that the aforesaid provision

allowing a covered entity to make inquiries into the ability of an employee to perform job-

related functions is limited to the "voluntary medical examinations" which are permitted in the first sentence of Section 12112(d)(4)(B).

Accordingly, Plaintiff's allegation of a violation of Section 12112(d)(4)(C), if given its plain and ordinary meaning, necessarily implicates Section 12112(d)(4)(B)'s statement that "a covered entity may make inquiries into the ability of an employee to perform job related functions." As the Magistrate Judge found, "[t]here is no evidence to dispute Villella's assertion that he made these inquiries in an effort to determine the legitimacy of the positive ion scan and whether Bomba was fit to return to duty." (Doc. 51, at 43).

Likewise, the R&R correctly states that "Bomba also presents a separate argument that various defendants improperly disclosed her confidential medical information in violation of 42 U.S.C. § 12112(d)(4)(C)," and further notes that "[t]his subsection prohibits the improper disclosure of confidential medical information that is obtained pursuant to 12112(d)(4)(B)." (Id. at 44). There is, therefore, no need for Plaintiff to assert as a separate violation in connection with her claim of unlawful disclosure of medical information that Section 12112(d)(4)(B) was separately violated. Of course, whether Bomba can prove such improper disclosure of confidential information presents a genuine dispute for trial, as the Magistrate Judge found in the following statement, which this Court adopts:

> Villella and Soden, on the other hand, appear to have learned of Bomba's Klonopin use through performing a Reasonable Suspicion evaluation, in which Villella was assessing whether Bomba was fit to return to duty. (Doc. 25, ¶¶ 32-37; Doc. 48, ¶¶ 32-37). A juror could find that this Reasonable Suspicion evaluation constituted an inquiry into Bomba's ability to perform job-related functions. See 42 U.S.C. § 12112(d)(4)(B). There is also evidence

in the record sufficient for a finder of fact to conclude that Villella and Soden failed to treat Bomba's medical information as confidential by disclosing her Klonopin use in front of Karlavage and later discussing this drug use in front of other staff. (Doc. 25, ¶¶ 32-37; Doc. 48, ¶¶ 32-37). Furthermore, the defendants do not allege that either Soden's or Villella's disclosure of Bomba's Klonopin use falls under any of the exceptions found in 42 U.S.C. § 12112(d)(3)(B)(i),(ii), or (iii). Finally, there is evidence in the record that Bomba suffered injury from this and other disclosures of her Klonopin use and confidential medical information, including emotional trauma.

(*Id*. at 46).

For these reasons, Defendants' second objection will be overruled.

### III. CONCLUSION

To summarize:

Plaintiff's objections to the Magistrate Judge's recommendation that Defendants be granted an opportunity for supplemental briefing in support of their contention that summary judgment should be granted to Defendants Villella, Soden, the DOC, and SCI-Waymart as to Counts I and II of Plaintiff's Amended Complaint are sustained and Defendants' request for supplemental briefing is denied.

Plaintiff's objection to the recommendation that summary judgment be entered in favor of the Defendants with respect to Plaintiff's ADA and RA claims in Counts I and II related to Defendants' alcohol breath test and disability related inquiries is sustained in part.

Plaintiff's objection to the recommendation that summary judgment be granted as to her claims of retaliation in Count III is overruled.

Plaintiff's objection to the recommendation that the individual defendants be granted qualified immunity in Counts V, VI, and VII, which state claims of violations of Bomba's constitutional rights to privacy of her medical information, privacy in connection with the drug tests of July 15, 2014, and with respect to the violation of her privacy in connection with her claim of direct observation of her genitalia in the urine specimen collection process, are sustained.

Defendants' objections with respect to the Magistrate Judge's recommendations denying summary judgment with respect to certain portions of Counts I and II are overruled.

Accordingly, Plaintiff's claims as sustained in Counts I, II, V, VI, and VII, of the Amended Complaint remain for trial.

A separate Order follows.

Robert D. Mariani
United States District Judge